UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:15 CR 8 SNLJ (ACL) |
| | ) |
| DARMARRO L. HENDRIX, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Pending before the undersigned is Defendant Darmarro L. Hendrix's Motion to Suppress (Doc. 31) evidence and statements that were obtained following the stop of a Tahoe in which he was a passenger. Hendrix argues that no traffic violation was committed, which would make the stop of the Tahoe unlawful. He also argues that the officers' directive for Hendrix to reenter the Tahoe was an unlawful seizure. Hendrix requests suppression of all physical objects seized from him, as well as his statements. The Government filed a Brief in Opposition to Hendrix's suppression motion. (Doc. 34.)

An evidentiary hearing was held on April 15, 2015. (Doc. 36.) Two Steele Police Department Officers testified at the hearing, Officer Richard Altice and Officer Josh Carter. Both officers were cross-examined extensively by defense counsel. In addition, two lay people testified on behalf of the Defendant, including: a woman named Tammy Barber and the Defendant's girlfriend.

The parties filed post-hearing memoranda (Docs. 40 and 43), after which the matter was taken under submission. Based on the testimony and evidence adduced and having had the opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned recommends that the following findings of fact and conclusions of law be adopted, and that the Defendant's Motion to Suppress be denied.

## I. Findings of Fact

Hendrix is charged with being a previously convicted felon in possession of a firearm. (Doc. 2.) Hendrix has two prior felony convictions—one for Possession of Crack Cocaine and the other for Burglary First Degree. *Id.*

On November 29, 2014, Steele Police Officers Richard Altice and Josh Carter were on routine patrol around 6:30 p.m., when they observed a Tahoe parked in the middle of Yarbrough Street.[1] The Tahoe was motionless in the middle of the street for between two and five minutes.

Although the identity of the occupants did not become known to the officers until later, the driver of the Tahoe was Edward Covington, Jr. The Defendant, Darmarro Hendrix, was in the front passenger seat. Hendrix's girl-friend and her sister were in the backseat. Hendrix's girl-friend testified that Covington had been drinking and he stopped in the street for about five minutes to fix the car speakers. (Tr. 126, 137.)

---

[1] There is some discrepancy in the testimony of the officers regarding whether the Tahoe was stopped on Factory Drive or on Yarbrough Street, however, the parties agree and the undersigned finds that the location where the Tahoe stopped in the middle of the roadway was Yarbrough Street.

Officer Altice testified that while travelling down First Street in Steele, he observed the Tahoe stopped. He explained that the vehicle "was travelling and came to a stop. . .in the middle of the roadway." (Doc. 41 at 7.) Officer Altice indicated that in order for oncoming traffic, or a vehicle coming from behind the Tahoe to pass the Tahoe, such vehicles "would have to take the grass in order to pass it." *Id.* at 8. Officer Altice believed that such conduct was a violation of a city ordinance. He also had concerns that the operator of the vehicle may have been under the influence of a prohibited substance based on the odd behavior of being parked in the middle of the street.

Although Officer Altice was not initially aware of who was driving the Tahoe, he knew that it belonged to Edward Covington, Jr. On multiple prior occasions, Officer Altice had stopped Covington in the Tahoe on suspicion of driving while intoxicated. Officer Altice testified that he had previously issued citations to Covington for possession of marijuana, as well as operating a motor vehicle with an open container.

Both officers testified that there is a city ordinance that prohibits vehicles from parking in the street in a manner that obstructs traffic. In reference to the Tahoe on the evening in question, Officer Carter explained that he and Officer Altice were "patrolling down First Street. . .coming up towards Factory Drive. There was a tan Tahoe parked in the middle of the street." (Doc. 41 at 67.) When Officer Carter observed the Tahoe in the middle of the roadway, he also believed the Tahoe was in violation of the city ordinance. The applicable Steele City Code section provides:

> No person shall park any vehicle upon a street, other than an alley, in such a manner or under such conditions as to leave available less than ten (10) feet of the width of the roadway for free movement of vehicular traffic.

Steele City Code § 355.020, Gov't. Ex. #1.

After observing the Tahoe parked in the middle of Yarbrough Street, Officer Altice pulled in behind the Tahoe. Around that time, Officer Altice turned on his emergency lights and Covington began to drive the Tahoe forward. Within a very short distance, Covington pulled into the driveway of a residence. The officers reported to the Pemiscot County dispatcher that they were making a traffic stop.

When the Tahoe stopped, Hendrix exited the front passenger door of the vehicle. The area was well lit as the Tahoe lights were on, the patrol car lights were on, including the spotlight, and the residence for the driveway where the Tahoe and patrol car parked was lit up with Christmas lights. Officer Altice immediately recognized Hendrix, who started to walk away from the Tahoe. Officer Altice and Officer Carter made verbal commands for Hendrix to stop and return to the Tahoe based on concerns for officer safety since multiple individuals remained within the vehicle. The officers explained that when multiple individuals are in a stopped vehicle it is safer to keep everyone together as that makes it easier to keep an eye on everyone. Hendrix ignored the officers' commands for him to stop and Officer Altice observed Hendrix pull out a gun. A struggle for the gun took place between Hendrix and Officer Altice. Hendrix pointed the gun in the direction of Officer Carter during the struggle and ultimately threw the gun away from the scuffle.

Hendrix's resistance was sufficient enough that the physical efforts of both officers were required to secure him in hand restraints. Officer Altice knew that Hendrix was a previously convicted felon. Hendrix was arrested for being a previously convicted

felon in possession of a firearm. The gun Hendrix threw was recovered by Officer Altice. A search of Hendrix's person by Officer Carter resulted in the seizure of a small amount of methamphetamine, a magazine for a .380 handgun loaded with four rounds of ammunition, a single .380 caliber bullet, and other items. Covington consented to a search of the Tahoe and the officers located another live .380 caliber bullet in the front passenger floorboard between the passenger seat and the console.

Hendrix was very upset about his arrest and made a number of statements that the officers were going to have to kill him that night and that he was not going to jail. Hendrix demonstrated his dismay regarding his arrest by banging his head against the patrol car window before being transported to the police station. Once there, he banged his head against a snack machine in the hallway, as well as on a cell door in his jail cell. The officers did not ask Hendrix any questions.

As to the driver of the Tahoe, Edward Covington, Jr., the officers communicated with him after securing Hendrix. The officers could smell the odor of alcohol on his breath, but they did not have the proper equipment with them to test his blood alcohol level. Covington was not cited for any driving violation, but was required to allow Hendrix's girl-friend to drive the Tahoe from the scene of the stop.

Hendrix now requests suppression of the evidence seized and statements he made following the traffic stop. He contends that 1) it was unreasonable for the officers to believe that Covington had violated the Steel City Code (Doc. 40 at 2.) and 2) the officers' instructions for Hendrix to reenter the Tahoe amounted to an unlawful and unreasonable seizure, *id.* at 3.

## II. Conclusions of Law

The undersigned concludes that it was objectively reasonable for Officers Altice and Carter to believe that Edward Covington, Jr., was in violation of a traffic law when they observed his Tahoe stopped in the middle of the street for at least two minutes. In addition, it was objectively reasonable for Officer Altice to believe that Covington might be under the influence of alcohol or drugs based on the odd parking behavior. As a result, the officers had probable cause to stop the Tahoe. Furthermore, when Hendrix attempted to walk away from the traffic stop it was lawful for the officers to direct him to return to the vehicle in order to alleviate officer safety concerns. All the physical evidence seized from Hendrix and the Tahoe, as well as the statements Hendrix made that evening are admissible at trial. A more thorough analysis follows.

### II.A. Traffic Stop and Detention were lawful.

The Eighth Circuit has repeatedly held that "*any* traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001) (emphasis in original). *See also United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc); *United States v. Mallari*, 334 F.3d 765 (8th Cir. 2003). An officer is justified in stopping a motorist when the officer "objectively has a reasonable basis for believing that the driver has breached a traffic law." *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996). *See United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999) (officer's mistaken belief, but objectively reasonable basis for believing, that a traffic violation occurred supported traffic stop). Once an officer has a right to stop a driver, the officer may "conduct an

investigation 'reasonably related in scope to the circumstances that justified the interference in the first place.'" *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (quoting *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir. 1990)).

Here, it was objectively reasonable for Officer Altice to believe that the person responsible for parking the Tahoe in the middle of Yarbrough Street for an extended period of time had committed a traffic offense. Hendrix's suggestion that the ordinance at issue is only violated if a vehicle is turned off is unreasonable. For instance, people frequently park in various locations and remain in their vehicles with the engine running. In those situations, it would be uncommon to refer to the car as "stopped" rather than as "parked." A common sense reading of the Steele City ordinance supports that if a person stops in the middle of the roadway and there is not sufficient room for other vehicles to pass the stopped car, such person would be in violation of the ordinance. Hendrix's semantic argument regarding the city ordinance is without merit.

The Court finds that Officer Altice's action in stopping Covington's vehicle for what he perceived to be a violation of the City of Steele's Code for "Parking Not to Obstruct Traffic" and based on concern the driver was impaired, was objectively reasonable in the circumstances. Even if Officer Altice was mistaken, the reasonableness of his actions is determined by what the officer reasonably knew at the time. *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005). His testimony was that he believed the Tahoe driver's action of stopping for a period of at least two minutes in the middle of a city street was a violation of the city ordinance for "Parking Not to Obstruct Traffic"

and that the operator of the Tahoe may be impaired based on the strange parking behavior.

In *Smart*, the Eighth Circuit concluded that the officer involved had an objectively reasonable basis to stop the defendant's vehicle if the officer reasonably suspected that the defendant was operating a vehicle that did not comply with state traffic laws. In the instant case, Officer Altice reasonably suspected that Covington was parked on Yarbrough Street in such a manner as to obstruct traffic in that there was not sufficient roadway for his police car to drive around the Tahoe without driving on someone's yard. Section 355.020 of the Steele City Code requires that no person park in the street in a manner resulting in less than ten feet of width being available for the free movement of other vehicles. It was objectively reasonable for Officer Altice to stop the Tahoe based on his belief that Covington was in violation of the city ordinance and that Covnigton may have been driving under the influence.

The Court finds the stop of the Tahoe was according to law and constitutional.

## II.B. Officers' directives for occupant to return to vehicle were lawful.

Hendrix's Motion also alleges that the officers' orders for him to return to the vehicle after the traffic stop were not justified and resulted in an unlawful seizure. An examination of the applicable case law supports that Hendrix was lawfully seized as a result of the traffic stop.

First, as the Supreme Court has repeatedly held, a traffic stop results in a seizure of the occupants of the vehicle. *Brendlin v. California*, 551 U.S. 249, 255-56 (2007). Furthermore, it is well settled that a police officer who initiates a traffic stop may

exercise reasonable superintendence over the car and all occupants following traffic stops. *United States v. Bonner*, 363 F.3d 213, 216 (3rd Cir. 2004) (examining development of Supreme Court cases expanding permissible intrusions on the movements of occupants). *See also United States v. Moorefield*, 111 F.3d 10, 11-14 (3rd Cir. 1997) (when passenger made suspicious hand and body movements, all occupants of car could be ordered to remain in car with their hands up following traffic stop for personal safety of officers). In *United States v. Oliver*, 550 F.3d 734, 738 (8th Cir. 2008), the Eighth Circuit noted an important risk posed by passengers as follows, "a person who is allowed to walk away from a stop without a pat-down search could hypothetically turn around and shoot officers remaining at the scene." As the Supreme Court elucidated:

> [A] sensible person would not expect a police officer to allow people to come and go freely...the passenger will expect to be subject to some scrutiny, and his attempt to leave the scene would be so likely to prompt an objection from the officer that no passenger would feel free to leave in the first place.

*Brendlin*, 551 U.S. at 257.

The Government noted that traffic stops pose very real concerns to officer safety and courts have expanded the degree to which the liberty of passengers may be intruded upon. As the Supreme Court recognized:

> [D]anger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car. While there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal. We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.

*Maryland v. Wilson*, 519 U.S. 408, 414 (1997). The Supreme Court also pointed out the fact that

> [i]t would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.

*Id.* The Supreme Court made this statement following its consideration of circumstances where ordering a passenger out of a vehicle allows the police to separate vehicle occupants from weapons that remain within the vehicle. That scenario does not address the situation that occurred here, wherein an occupant of a vehicle (Hendrix) attempted to evade the officer's lawful authority to investigate the traffic violations while physically possessing a weapon rather than leaving the weapon behind in the vehicle.

The Eighth Circuit noted that the converse of ordering occupants out of a vehicle for officer safety is also reasonable, that is, officer safety may require a passenger to be ordered to remain inside a vehicle during a traffic stop. In *United States v. Sanders*, 510 F.3d 788, 790-91 (8th Cir. 2007), a traffic stop was made and before the officer could approach the car, the front passenger got out. The officer had to order the passenger to get back in the car three times before the passenger complied. Once in the car, the officer approached the driver's side and from that vantage point could see the handle of a pistol protruding from the passenger's left front pocket. The officer radioed for assistance and upon the arrival of other officers, the passenger was forcibly removed from the car and the gun was secured. The officers later learned that the passenger was a convicted felon

and was prohibited from possessing the pistol. *Sanders* found that "the amount of time that [the passenger] was detained without reasonable suspicion that he had committed a crime was de minimis." *Sanders*, 510 F.3d at 791, citing ("We thus conclude that, even if a suspicionless seizure occurred during the period from the conclusion of the lawful traffic stop until the officers unquestionably had probable cause, it was a *de minimis* intrusion that did not constitute an unreasonable seizure within the meaning of the Fourth Amendment."). *Sanders* held that the gun found in the passenger's pocket was not the product of an illegal search, because the officer's act of detaining the passenger until other officers arrived was reasonable under the Fourth Amendment.

This Court finds that several factors support that the officers' orders for Hendrix to return to the Tahoe and their response to Hendrix's non-compliance with that directive was reasonable. First, Hendrix's exit from the vehicle separated him from multiple occupants who remained in the Tahoe, which posed a risk to the officers' safety. Next, Officer Altice immediately recognized Hendrix and knew Hendrix to be a previously convicted felon. After Hendrix failed to comply with the officers' directives to return to the Tahoe, Officer Altice observed Hendrix in possession of a firearm, which converted the situation from a simple traffic stop to the arrest of Hendrix for being a previously convicted felon in possession of a firearm based on probable cause. The time that elapsed between Hendrix's exit from the Tahoe following the traffic stop and the officers restraining him based on the observation of a firearm was no more than a few minutes. The event happened so quickly that Officer Altice did not even have the opportunity to approach the driver regarding the traffic stop; that business could not be addressed until

the officer safety concerns were addressed and Hendrix was separated from the firearm and secure in the patrol car.

The Officers' directives for Hendrix to reenter the Tahoe were lawful.

## II.C. Other evidence

The Defendant asserts that any statements he made were also the product of the unlawful seizure. (Doc. 31.)

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011), quoting *Segura v. United States*, 468 U.S. 796, 804 (1984). "[T]he defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence." *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007).

In this case, because the initial seizure of Hendrix occurred by virtue of the lawful traffic stop, and he was subsequently lawfully arrested based on the discovery of a weapon on his person, the officers did not violate Hendrix's constitutional rights and his volunteered statements were not fruit of the poisonous tree. *See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013). Hendrix did not argue that his statements were involuntary or that there was a violation of

*Miranda v. Arizona*, 384 U.S. 436, 448-450 (1966), so those issues are not considered.

The Court finds that the statements Hendrix made during his encounter with the police on the evening of November 29, 2014 were not the product of any interrogation and that his statements were volunteered. Hendrix's statements may be offered at trial.

Hendrix did not specifically challenge the seizure of the single .380 caliber bullet that was found on the passenger floorboard of the Tahoe. Based on the fact the owner of the Tahoe consented to a search of the vehicle, the bullet is not subject to suppression, *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), and it may be offered at trial.

### III. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Evidence (Doc. 31) be **denied**.

Further, the parties are advised that they have fourteen days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

_/s/ Abbie Crites-Leoni_
ABBIE CRITES-LEONI
Dated this 17th day of June, 2015.   UNITED STATES MAGISTRATE JUDGE